United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

X ONE, INC.,

             Plaintiff,

      v.

UBER TECHNOLOGIES, INC.,

             Defendant.

Case No. 16-CV-06050-LHK

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

Re: Dkt. No. 24

      Plaintiff X One, Inc. ("X One" or "Plaintiff") filed a patent infringement suit against Defendant Uber Technologies, Inc. ("Uber" or "Defendant") and alleged that Defendant infringed the claims of U.S. Patent Nos. 8,798,647 and 8,798,593.  Before the Court is Defendant's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 24 ("Mot.").  Having considered the submissions of the parties, the relevant law, and the record in this case, the Court DENIES Defendant's Motion to Dismiss.

I.      **BACKGROUND**

      A.      **Factual Background**

            1.      **The Parties**

      Plaintiff X One is a Delaware corporation with its primary place of business in Union City,

California.  ECF No. 1 ("Compl.") ¶ 1.  Plaintiff is the original patent applicant and assignee of the X One Patents.  *Id.* Ex. A.  The patented technology was developed by Plaintiff's principal, Richard Haney.  *Id.* ¶ 7.  Defendant Uber is a Delaware corporation with its primary place of business in San Francisco, California.  *Id.* ¶ 2.

### 2.   The X One Patents

At issue are U.S. Patent Nos. 8,798,647 (the "'647 patent'") and 8,798,593 (the "'593 patent") (collectively, the "X One Patents").  Compl. ¶ 11.  The '593 patent is titled "Location Sharing and Tracking Using Mobile Phones or Other Wireless Devices."  Compl. Ex. B ('593 patent).  The '647 patent is titled "Tracking Proximity of Services Provider to Services Consumer."  Compl. Ex. A ('647 patent).  The application for the '647 patent was a continuation of the patent application that issued as the '593 patent, and thus the two patents share the same specification.  *See Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1337 (Fed. Cir. 2006) ("The patents are continuations or divisionals of a common parent application and therefore necessarily have almost identical specifications.").  For simplicity, unless specifically referring to the '593 patent or the '647 patent, the Court's citations to the text and figures of the X One Patents refer to the '593 patent specification.

The X One Patents relate to "[a] system for exchanging GPS or other position data between wireless devices."  '593 patent at Abstract.  The invention thus involves "phones [or] other wireless devices" that "are programmed with software . . . to allow mutual tracking and optional position mapping displays of members of groups."  *Id.* at col. 2:35–40.  These devices "work with a . . . server coupled to the internet."  *Id.*  Critically, these devices "must be web enabled to send and receive TCP/IP or other protocol packets over the internet to the . . . server."  *Id*. at col. 2:25–27.  The devices also contain GPS receivers, and, in preferred embodiments, "sufficiently large liquid crystal displays."  *Id.* at col. 2:23–24.

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
Northern District of California

The specification provides the following diagram of the contemplated communications between the devices that form the invention:



*Id.* at Fig. 2A.

The specification describes the communications that occur to make the invention function. The requesting phone sends packets through the local phone carrier system, which is then relayed through the internet to a server.  *Id.* col. 5:59–6:28.  The server then obtains the relevant data from the phones associated with individuals on a buddy list for the requesting phone.  *Id.*  The server then relays the requested information—location data for each phone associated with a "buddy" and a map showing that location—back to the requesting phone through the internet and carrier service.  *See also id.* col. 2:51–64 ("[T]he process of the invention [] allows exchanging and mapping of position data with persons on a Buddy List.").

However, the specification is not solely limited to the use of a server, and outlines a more generalized process as well for the functioning of the invention.  Figure 13 of the X One Patents

3

provides a "flowchart of the method of exchanging GPS position data among cell phones of a watch list":



*Id.* at Figure 13A & 13B.

In this illustrated method, a buddy location update request is received, the persons in the buddy list are identified, and the requesting device sends, through the cellular system, its location data to the phones in the buddy list. *Id.* Those phones receive the information, interpret it, and display that location on a map, and then obtain their own position and send their location to the people on their buddy list. *Id.*

Notably, "[t]he teachings of the invention do not require development of new cell phone or [personal digital assistant] technology nor do they require development of new cellular communication infrastructure." *Id.* at col. 2:44–49. The server used with the invention is "not limited to any specific language or technology nor is it limited to any specific wired or wireless solution or any particular transmission physical layer or protocol." *Id.* at col. 2:41–43. Thus, the

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
Northern District of California

1   disclosure concentrates on the method and software used to implement it on current systems.

2     According to the X One Patents, the prior art did not disclose a similar device.  The X One

3   Patents' specification states that the prior art included devices like OnStar, which only provided

4   "one way location sharing."  *Id.* at col. 1:32–35.  That service functioned "via GPS receivers and

5   cellular phone capability built into a car, [which allowed] an aid center [to] track cars all over the

6   world."  *Id.*  Similarly, the specification's description indicated that the prior art disclosed "[o]ther

7   commercial services [that] allow parents to track the locations of their children."  *Id.*  Parents

8   could "buy phones that were set up at the manufacturer to enable parents to locate [up to eight]

9   children."  *Id.* at col. 1:54–55.

10     However, this prior art did not allow "two way position information sharing" where, for

11   example, the child could track the location of the parent at the same time the parent was tracking

12   the location of the child.  *Id.*  Additionally, the prior art allegedly did not include a "mechanism to

13   add groups and members of groups" to the list of people being tracked.  Nor did the prior art have

14   a mechanism to add "instant buddies," defined as "temporary location sharing between phones on

15   an ask and accept basis which automatically expires after a configurable interval terminates."  *Id.*

16   at col. 1:60–65.

17     Although the prior art in the field did not allow changes to the individuals being tracked,

18   the teachings of the X One Patents allegedly allow "the users [to] change things on the fly in the

19   field."  *Id.* at col. 3:20.  Specifically, the X One Patents allow users, without manufacturer

20   intervention, to "add[] groups and members; add[] instant buddies, chang[e] the size of the area in

21   which their buddies can be tracked, [and] enabl[e] or disabl[e] the location information sharing

22   function without disabling the phone."  *Id.* at col. 3:20–25.

23     Although a number of the preferred embodiments disclosed in the specification use cell

24   phones with an installed application, the X One Patents' specifications note that the teachings of

25   the invention "can also be integrated into other products and services."  *Id.* at col. 3:3–4.

26   Specifically, through modifications in other devices, the teachings of the invention could be used

27   with "autos with GPS based navigation systems" or "handheld GPS navigation devices."  *Id.* at

28

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1  col. 3:5–19.

2  **3.  The Asserted Claims**

3  In the complaint, Plaintiff asserts that Defendant infringes claim 19 of the '593 patent and

4  claims 22 and 28 of the '647 patent ("asserted claims").  Compl. ¶¶ 61, 82.  The parties' briefing

5  addresses only these three claims.  Mot. at 4; Opp'n at 9–11.

6  The text of claim 19 of the '593 patent is as follows:

7  19. An apparatus, comprising:

8  a server;

9  a database representing an account for a first individual, the account having an associated buddy list that identifies multiple users;

10  software to request and store position information associated with cell phones
11  of plural ones of the multiple users by receiving information from cell phones associated with the respective multiple users in a manner not requiring
12  concurrent voice communications; and

13  software responsive to a request from the first individual to obtain a map, to obtain a last known position for multiple users identified by the buddy list, to
14  plot the last known location of at least two of the multiple users on the map, to transmit the map with plotted locations to the first individual, and to permit
15  the first individual to change geography represented by the map by zooming the map and to responsively transmit to the first individual a map representing
16  the changed geography with plotted position of at least one of the multiple users, each in a manner not requiring concurrent voice communications.

17  '593 Patent at col. 30:49–col. 31:2.

18  The text of the asserted claims, claims 22 and 28, of the '647 patent is as follows:

19  
20  22. A method of tracking proximity of position associated with a first wireless device relative to position of a second wireless device, wherein the first wireless
21  device is associated with a requestor of a desired service and the second wireless device is associated with a provider of the desired service, the method
22  comprising:

23  selecting the provider of the desired service in association with an application launched by the requestor on the first wireless device, wherein the second
24  wireless device is associated with the provider and is thereby selected in associated [sic] with launch of the application;

25  causing receipt of information on the first wireless device representing
26  position of the provider, dependent on global positioning system (GPS) position data provided by the second wireless device, and receipt of
27  information representing a map associated with the position associated with

28  
6

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1    the first wireless device and the position of the second wireless device;

2    causing display of the map on the first wireless device with the position associated with the requestor and the position of the second wireless device rendered thereon; and

3

4    causing receipt of information on the first wireless device representing intermittent positional update dependent on GPS position data provided by the second wireless device, and causing update of display of the map on the first wireless device with respective position associated with the first wireless device and positional update dependent on the GPS position data provided by the second wireless device rendered thereon;

5

6

7    wherein selecting the provider of the desired service includes forming a use-specific group to have the first wireless device and the second wireless device in connection with the request for the desired service.

8

9    28. An apparatus comprising instructions stored on non-transitory machine-readable media, the instructions when executed operable to:

10

11    cause receipt of information on the first wireless device representing position of the second wireless device and a map associated with position associated with the first wireless device and the position of the second wireless device;

12

13    cause display of the map on the first wireless device with the position association with the first wireless device and the position of the second wireless device rendered thereon; and

14

15    cause receipt of information on the first wireless device representing positional update of the second wireless device, and cause update of display of the map on the first wireless device with the position associated with the first wireless device and updated position of the second wireless device rendered thereon;

16

17

18    wherein one of the first wireless device and the second wireless device is associated with a provider of a desired service, wherein the update of the display is to [be] performed to indicate proximity of and direction between the provider of the desired service and a position associated with a requestor of the desired service, wherein the causing of the receipt of the information representing the position, the causing of the display, and the causing of the receipt of information representing positional update are invoked responsive to launching an application on the first wireless device in connection with a request by the requestor for the desired service, wherein the provider is selected in connection with the request for the desired service, wherein the instructions when executed are to cause formation of a use-specific group to have the first wireless device and the second wireless device in connection with the request for the desired service.

19

20

21

22

23

24

25    '647 Patent at col. 30:47–col. 31:12, col. 31:37–col. 32:5.

26

       **B.**      **Procedural History**

27

28

United States District Court
Northern District of California

1   On October 19, 2016, Plaintiff filed the instant patent infringement suit.  In its complaint,

2   Plaintiff alleged that Defendant "has infringed and continues to infringe one or more claims of the

3   [X One Patents]."  Compl. ¶ 13.  The products and services accused included "Uber's mobile

4   device applications on iOS, Android, and Microsoft operating systems" as well as "the Uber ride-

5   sharing, car-pooling, and delivery services."  *Id.*

6   On December 9, 2016, Defendant filed the instant Motion to Dismiss, ECF No. 24

7   ("Mot.").  Defendant also filed a request for judicial notice on December 9, 2016.[1]  ECF No. 25.

8   On January 6, 2017, Plaintiff filed an opposition to Defendant's Motion to Dismiss, ECF No. 35

9   ("Opp'n"), and on January 13, 2017, Defendant filed a reply, ECF No. 38 ("Reply").

10   ## II.  LEGAL STANDARD

11   ### A.   Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

12   Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

13   action for failure to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell*

14   *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

15   plaintiff pleads factual content that allows the court to draw the reasonable inference that the

16   defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a

17   'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

18   unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  For

19   purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the

21   [1] Defendant requests judicial notice of two patents that are listed in the specification of the X One Patents, U.S. Patent Nos. 6,169,902 and 7,116,985.  On a motion to dismiss, the Court is limited to "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."  *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012).  The Court may take judicial notice of facts not subject to reasonable dispute that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  "[M]atters of public record" are the appropriate subjects of judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1125– 26 (9th Cir. 2002).  Patents are "matter[s] of public record and the proper subject of judicial notice."  *Sebastian Brown Prods. LLC v. Muzooka Inc.*, 2016 WL 949004, at *5 (N.D. Cal. Mar. 14, 2016).  Accordingly, the Court GRANTS Defendant's request for judicial notice of U.S. Patent Nos. 6,169,902 and 7,116,985.

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1 complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving

2 party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

3       Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely

4 because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064

5 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere

6 "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to

7 dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678.

8 Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish

9 that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir.

10 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

11     **B.**     **Motions to Dismiss for Patent Validity Challenges Under 35 U.S.C. § 101**

12       Defendant's Motion asserts that the X One Patents fail to claim patent-eligible subject

13 matter under 35 U.S.C. § 101 in light of the United States Supreme Court's decision in *Alice Corp.*

14 *Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014).  Whether a claim recites patent-

15 eligible subject matter under § 101 is a question of law.  *In re Roslin Inst. (Edinburgh)*, 750 F.3d

16 1333, 1335 (Fed. Cir. 2014) ("Section 101 patent eligibility is a question of law[.]"); *Dealertrack,*

17 *Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (same).  Accordingly, a district court may

18 resolve the issue of patent eligibility under § 101 by way of a motion to dismiss.  *See, e.g.,*

19 *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1345

20 (Fed. Cir. 2014) (affirming determination of ineligibility made on 12(b)(6) motion); *Ultramercial,*

21 *Inc. v. Hulu, LLC*, 772 F.3d 709, 713 (Fed. Cir. 2014) (same); *see also buySAFE, Inc. v. Google,*

22 *Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (affirming determination of ineligibility made on

23 motion for judgment on the pleadings).

24       Although claim construction is often desirable, and may sometimes be necessary, to

25 resolve whether a patent claim is directed to patent-eligible subject matter, the Federal Circuit has

26 explained that "claim construction is not an inviolable prerequisite to a validity determination

27 under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1273–

28

9

United States District Court
Northern District of California

1274 (Fed. Cir. 2013).  Where the court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings.  *Content Extraction*, 776 F.3d at 1349; *see also Cardpool, Inc. v. Plastic Jungle, Inc.*, 2013 WL 245026, at *4 (N.D. Cal. Jan. 22, 2013) (same), *aff'd*, 817 F.3d 1316 (Fed. Cir. 2016).

## III.   DISCUSSION

As noted above, Defendant contends that the asserted claims of the X One Patents "invoke an abstract idea without adding any inventive concept."  Mot. at 6.  Defendants therefore argue that dismissal is appropriate because the asserted claims "cannot survive scrutiny" under 35 U.S.C. § 101.

Section 101 of Title 35 of the United States Code "defines the subject matter that may be patented under the Patent Act."  *Bilski v. Kappos*, 561 U.S. 593, 601 (2010).  Under § 101, the scope of patentable subject matter encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  *Id.* (quoting 35 U.S.C. § 101).  These categories are broad, but they are not limitless.  Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice*, 134 S. Ct. at 2354 (quotation marks omitted).  These three exceptions are not patent-eligible because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none."  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (quotation marks omitted).  The United States Supreme Court has explained that allowing patent claims for such purported inventions would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws.  *Id.* at 70.  However, the United States Supreme Court has also cautioned that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Alice*, 134 S. Ct. at 2354 (quotation marks and alterations omitted).  Accordingly, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Id.*

In *Alice*, the leading case on patent-eligible subject matter under § 101, the United States

United States District Court
Northern District of California

10

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

Supreme Court refined the "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" originally set forth in *Mayo*, 566 U.S. at 77.  This analysis, generally known as the "*Alice*" framework, proceeds in two steps as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept' "—i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice*, 134 S. Ct. at 2355 (citations omitted and alterations in original); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (describing "the now familiar two-part test described by the U.S. Supreme Court in *Alice*").

The parties do not dispute that the methods of the asserted claims fall within the broad categories identified in 35 U.S.C. § 101 (i.e., as a "process" or "machine").  Instead, Defendants argue that the asserted claims constitute unpatentable "abstract ideas."  *Alice*, 134 S. Ct. at 2354 (quotation marks omitted).  To address this argument, the Court turns to the application of the *Alice* framework described above to the asserted claims of the X One Patents.

**A.    *Alice* Step One—Whether the Asserted Claims Are Directed to an Abstract Idea**

The Court "must first determine whether the claims at issue are directed to [an abstract idea]."  *Id.* at 2355.  Neither the United States Supreme Court nor the Federal Circuit has set forth a bright line test separating abstract ideas from concepts that are sufficiently concrete so as to require no further inquiry under the first step of the *Alice* framework.  *See, e.g.*, *id.* at 2357 (noting that "[the United States Supreme Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (observing that the United States Supreme Court did not "delimit the precise contours of the 'abstract ideas' category in *Alice*") (quotation marks omitted).  As a result, in

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1    evaluating whether particular claims are directed to patent-ineligible abstract ideas, courts have

2    generally begun by "compar[ing] claims at issue to those claims already found to be directed to an

3    abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir.

4    2016).

5         In addition, courts look to whether the process at issue has an analog in the "brick-and-

6    mortar" context. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir.

7    2016) ("*Intellectual Ventures B*") (finding an email processing software program to be abstract

8    through comparison to a "brick-and-mortar" post office).  Similarly, the Federal Circuit has

9    considered whether the claims are, in essence, directed to a mental process or a process that could

10   be done with pen and paper. *See, e.g.*, *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d

11   1366, 1372 (Fed. Cir. 2011) (claim for verifying the validity of a credit card transaction over the

12   Internet was invalid because the "steps can be performed in the human mind, or by a human using

13   a pen and paper").[2]

14        Moreover, when computer-related claims are at issue, courts look to whether the claims

15   purport to "improve the functioning of the computer itself," which may suggest that the claims are

16   not abstract.  *Alice*, 134 S. Ct. at 2359.  Thus, claims that recite improvements in computer

17   functionality are patent eligible. *See Enfish*, 822 F.3d at 1339 (method for improving "the way a

18   computer stores and retrieves data in memory" was non-abstract); *McRO v. Bandai Namco Games*

19   *Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims "focused on a specific asserted

20   improvement in computer animation" were non-abstract).  However, if "computers are invoked

21   merely as a tool" in the asserted claim to carry out an abstract process, the claim is still considered

22   to be abstract. *Enfish*, 822 F.3d at 1336.

23        With these principles in mind, the Court turns to the case at hand.  As discussed above, the

24

25   _____

     [2] One court has noted that, like all tools of analysis, the "pencil and paper" analogy must not be

26   unthinkingly applied.  *See California Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974,
     995 (C.D. Cal. 2014) (viewing pencil-and-paper test as a "stand-in for another concern: that

27   humans engaged in the same activity long before the invention of computers," and concluding that
     test was unhelpful where "error correction codes were not conventional activity that humans
     engaged in before computers").

28   _____

                                              12

     Case No. 16-CV-06050-LHK
     ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
Northern District of California

Court's task at this first step of the *Alice* framework is to examine the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). Here, Defendants contend that the asserted claims' "'character as a whole' is directed to the abstract concept of gathering and displaying position information of wireless device users." Mot. at 1; *see also id.* at 8 ("But to the extent they describe a purported advance, it is on gathering and displaying information of a specified content, and not on any particular inventive technology for performing either function."). Defendant argues that "[t]he Federal Circuit repeatedly has declared processes of information collection and analysis similar to those reflected by the '593 and '647 patent claims to be abstract." *Id.* at 9. Additionally, Defendant argues that the asserted claims fail "to recite the technical details for how to achieve the claimed collection and display of position information of wireless device users." *Id.* at 13.

Plaintiff responds that Defendant has described the claims at an excessively high level of abstraction. Plaintiffs argue that the claims are instead directed to "the sharing of location data among specific groups of people, using self-updating maps, for limited time periods, without concurrent voice communications." Opp'n at 17. When read in this manner, Plaintiff argues that the claims "address the technological problems of how to share location information between devices without overtaxing system resources or violating individual privacy concerns." *Id.* at 9. Moreover, Plaintiff argues that the claims do not preempt every way of "gathering and displaying position information of wireless device users," and that the cases cited by Defendant are inapposite because the claims in those cases did not involve specific technical solutions to technological problems. Opp'n at 13–17.

The Court first discusses the character of each of the asserted claims, and then discusses whether prior cases or other tests approved by the Federal Circuit indicate that the claims are directed towards an abstract idea.

### 1.      Character of the Claims

The Court begins by examining each asserted claim in its entirety to understand the

13

character of each claim as a whole. *Ultramercial*, 772 F.3d at 714 ("We first examine the claims because claims are the definition of what a patent is intended to cover"); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) ("[T]he court must first identify and define whatever fundamental concept appears wrapped up in the claim.") (quotation marks omitted); *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (2016) (discussing the "basic thrust" of the claims).  This "'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether their character as a whole is directed to excluded subject matter." *Enfish*, 822 F.3d at 1335.  In distilling the purpose of a claim, the Court is careful not to express the claim's fundamental concept at an unduly "high level of abstraction . . . untethered from the language of the claims," but rather at a level consonant with the level of generality or abstraction expressed in the claims themselves. *Id.* at 1336.

However, the Court need not include every claim limitation in the "directed to" inquiry. S*ee, e.g.*, *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016) ("Our cases generally follow the step one/step two Supreme Court format, reserving step two for the more comprehensive analysis in search of the 'inventive concept.'"); *Ultramercial*, 772 F.3d at 715 (describing "the concept embodied by the *majority* of the limitations" despite presence of other limitations) (emphasis added).  Instead, the Court only need include limitations that are part of the asserted claims' essential character, omitting claim limitations that are "secondary to (and dependent upon)" the major focus of a claim. *See Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 2016 WL 3196657, at *13 (N.D. Cal. June 9, 2016) (finding that the display of an error message from a simulator was secondary to the use of a simulator itself); *see also Ultramercial*, 772 F.3d at 715 ("[T]he addition of merely novel or non-routine components to the claimed idea [does not] necessarily turn[] an abstraction into something concrete.").

Here, the Court first addresses the claim from the '593 patent and then addresses the claims from the '647 patent.  As noted above, the Federal Circuit has referred to the inquiry in this section as a determination of the "heart," the "fundamental concept," the "character as a whole," or the "basic thrust" of the claim.  The Court understands this terminology to be interchangeable.

14

United States District Court
Northern District of California

1    However, for simplicity, the Court uses the term "character as a whole" throughout this order.

### a.       The '593 patent

3        Claim 19 of the '593 patent describes an "apparatus" with the following four elements:
(1) a server, (2) a database with an account for a user that contains a "buddy list" of other users,
(3) software that can "request and store" information from cell phones associated with multiple
users, and (4) software that, upon request from a first user, obtains the last known location of users
listed in the first user's buddy list, plots those locations on a map, sends that map to the first user,
and allows the first user to zoom the map in or out.  '593 patent at col. 30:49–col. 31:2.  This
apparatus functions "without concurrent voice communications."  *Id.*

        After reading the entirety of claim 19 for its character as a whole, the Court finds that
claim 19 of the '593 patent is "directed to" (1) the gathering, transmission, and display of the
location information of (2) a certain subset of individuals from a list.  The Court reaches this
conclusion by reading the entirety of the claim for its character as a whole and, through doing so,
observing that all four of its elements are aimed at gathering, transmitting, or displaying the
location information of a certain subset of individuals from a list.  The server, as understood from
the specification, is an intermediary between the two or more cell phones that mediates the
transmission of location information.  '593 patent at Fig. 2A.  The database stores the list that
defines which individuals will be tracked.  *Id.* at col. 30:49–51.  The two pieces of software
"request and store" the location information of other users, transmit that information to a
requesting person's cell phone, and display that information.  *Id.*

        The Court identifies the above character as a whole by considering claim 19 of the '593
patent in light of the specification.  The specification states that the '593 patent is "[a] system for
exchanging GPS or other location data between wireless devices" in which an "application
communicates with the GPS receiver and other wireless devices operated by buddies registered in
the user's phone."  '593 patent at Abstract; *see also Bascom*, 827 F.3d at 1348 (finding that "[t]he
specification reinforces [the claims being directed to filtering Internet content] by describing the
invention as relating 'generally to a method and system for filtering Internet content.'"); *cf. Enfish*,

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1    822 F.3d at 1337 (observing that "[t]he necessity of describing the claims in such a way is

2    underscored by the specification's emphasis that 'the present invention comprises a flexible, self-

3    referential table that stores data.'").

4          However, the Court acknowledges that this formulation of the character of the claim

5    excludes some claim limitations, including the "zoom" feature on the map display and the lack of

6    "concurrent voice communications."  *Id.*  While these are features of claim 19 of the '593 patent,

7    they are secondary to the claim's character as a whole.  Indeed, the "zoom" feature is simply a

8    more flexible way of displaying the location of the individuals on the list.  *Compare Papst*, 2016

9    WL 3196657 at *13 (holding that the character of the claims involved the use of a simulator to

10   perform a memory test and did not include the "error messages" that would display when the

11   simulator failed because the error messages were not part of the claims' "dominant concept").

12   Moreover, the lack of "concurrent voice communications" adds little to the character of the claim

13   as it simply narrows the mode of gathering, transmitting, and displaying the location information

14   of a certain subset of individuals from a list and does not alter the overall character of the claim.

15   *See Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (not

16   finding "use of internet" to be part of the character of the claim as a whole even though the claim

17   required internet usage).

18         Plaintiffs also argue that the following claim limitations—the presence of "self-updating

19   maps" and the ability for the location sharing to be for a "limited time period"—should be read

20   into the character as a whole of claim 19 of the '593 patent.  Opp'n at 17.  These features—a "self-

21   updating map[]" and the ability to track people for a "limited time period"—are mentioned in

22   claims 8, 9, and 10 of the '593 patent.  However, Plaintiff does not assert that Defendant infringes

23   these claims in the complaint.  With respect to the '593 patent, Plaintiff only asserts that

24   Defendant infringes claim 19.  These features are not mentioned in claim 19 of the '593 patent.

25   Moreover, claims 8, 9, and 10 of the '593 patent were not specifically mentioned in Plaintiff's

26   briefing.  The Court need not consider claims that Plaintiff has not asserted in the complaint.

27   *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) (citations omitted)

28

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1    ("The § 101 inquiry must focus on the language of the Asserted Claims themselves.").  Thus, the

2    Court need not consider whether these limitations should be read into claim 19's character as a

3    whole.

4         However, even if the Court were to consider claims 8, 9, and 10 of the '593 patent and

5    their additional claim limitations, the Court finds below, in the context of the '647 patent, that the

6    "self-updating map" or ability to track people for a "limited time period" features do not affect the

7    character of the claim as a whole.  The same analysis would also apply to the '593 patent.

8         The level of abstraction used here is comparable to Federal Circuit precedent addressing

9    similar claims.  In *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir.

10   2016), the Federal Circuit discussed the patentability of a claim for a "method of detecting events

11   on an interconnected electric power grid in real time over a wide area and automatically analyzing

12   the events on the interconnected electric power grid."  *Id.* at 1351.  The method included (1)

13   receiving data streams collected in real-time from geographically distinct points over an electric

14   power grid, (2) receiving data from power sources on the electric power grid, (3) receiving data

15   from other non-grid data sources, (4) detecting and analyzing events based on the information

16   from measurements in the received data, (5) displaying the results of the diagnosis of the events at

17   issue and other information from the data, (6) updating the information that is collected, and (7)

18   combining the data into an indicator of power grid health.  *Id.* at 1351–52.  The Federal Circuit

19   found that the "character as a whole" of this claim was "collecting information, analyzing it, and

20   displaying certain results of the collection and analysis."  *Id.* at 1353.

21        The character as a whole of claim 19 of the '593 patent described by the Court—the

22   gathering, transmission, and display of location information of a certain subset of individuals from

23   a list—involves a similar level of abstraction and thus is the correct statement of claim 19's

24   character as a whole.

25                      **c.    The '647 Patent**

26        The asserted claims from the '647 patent are similar to claim 19 of the '593 patent, but

27   relate to the gathering, transmission, and display of the location information of individuals

28

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
Northern District of California

1    requested to perform a service rather than a certain subset of individuals from a list.  For example,

2    claim 22 of the '647 patent states the following method: (1) the service requestor selects a service

3    provider through an application on his or her wireless device, (2) the location of the service

4    provider, as determined through GPS on the service provider's wireless device, is transmitted to

5    the service requestor's phone along with a map showing the location of the service requestor and

6    service provider, (3) a map of the service requestor's and service provider's locations are displayed

7    on the service requestor's wireless device, (4) the location of the service requestor and service

8    provider are updated intermittently on the map display on the service requestor's device, and (5)

9    the selection of the service provider creates a "use-specific group . . . in connection with the

10   request for the desired service" that includes the service requestor's and the service provider's

11   wireless devices.[3]  Accordingly, drawing upon its assessment of claim 19 of the '593 patent, the

12   Court finds that the "character as a whole" of the asserted claims of the '647 patent are "directed

13   to" the (1) gathering, transmission, and display of location information of (2) individuals requested

14   to perform a service.

15          Two features not present in claim 19 of the '593 patent are present in claims 22 and 28 of

16   the '647 patent: the "self-updating" feature and the "time limit" feature.  However, neither of these

17   additional claim limitations changes the character of the claim as a whole.  For example, the self-

18   updating feature is simply a timed repetition of the gathering, transmission, and display of location

19   information.  Both of these claim limitations are "secondary to (and dependent upon)" the actual

20   gathering, transmission, and display of location information that is at issue in these claims.  *Papst*,

21   2016 WL 3196657 at *13.  Indeed, in *Electric Power Group*, even though the claims included an

22   "updating" feature concerning the collection and display of information about a power grid, the

23   Federal Circuit found the claim to be directed to "collecting information, analyzing it, and

24   displaying certain results of the collection and analysis."  *Elec. Power Grp.*, 830 F.3d at 1352.

25

26   _____

27   [3] Claim 28 of the '647 patent is software used to carry out the method in claim 22 and is
     essentially the same as claim 22.  The main difference is that claim 22 does not specify that the
     wireless device used for the method have GPS, one of the aspects of claim 28.

28
     Case No. 16-CV-06050-LHK
     ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1    Accordingly, the Court concludes that claims 22 and 28 of the '647 patent are directed

2  towards the gathering, transmission, and display of the location information of individuals

3  requested to perform a service.

### 2.    Abstract Idea Analysis

5    Having determined the character of the asserted claims, the question then is whether the

6  "character as a whole" of the claims is directed to an unpatentable abstract idea.  *Enfish*, 822 F.3d

7  at 1335.  To perform this analysis, the Court first addresses comparable Federal Circuit precedent,

8  and then discusses the following two Federal Circuit tests: (1) whether the claimed actions are

9  comparable to activity in the "brick-and-mortar" context, and (2) whether the claims constitute an

10  improvement in computer functionality.

### a.    Comparison to Prior Case Law

12    As noted above, claim 19 of the '593 patent involves the gathering, transmission, and

13  display of location information of a certain subset of individuals from a list, and claims 22 and 28

14  of the '647 patent involves the gathering, transmission, and display of location information of

15  individuals requested to perform a service.  A number of Federal Circuit and district court cases

16  have addressed the patentability of claims similar, but not identical, to those at issue here.

17  Nevertheless, they provide useful guidance.

18    First, the Court notes that gathering, transmitting, and displaying information is an abstract

19  idea.  Information on its own is "intangible."  *Elec. Power Grp*, 830 F.3d at 1353.  As a result,

20  claims directed to the collection of information have regularly been held to be abstract, "including

21  when limited to particular content (which does not change its character as information)."  *Id.* at

22  1353 (citing cases).  Moreover, "merely presenting the results of abstract processes of collecting

23  and analyzing information, without more (such as identifying a particular tool for presentation), is

24  abstract as an ancillary part of such collection and analysis."  *Id.*

25    In *Electric Power Group*, as discussed above, the Federal Circuit applied these principles

26  to a "method of detecting events on an interconnected electric power grid in real time over a wide

27  area and automatically analyzing the events on the interconnected electric power grid."  *Id.* at

28

1351.  The Federal Circuit found that the "character as a whole" of this claim was "collecting

information, analyzing it, and displaying certain results of the collection and analysis."  *Id.*  at

1353.  As relevant here, the Federal Circuit held that the claims were directed to an abstract idea

because "[t]he advance the [claims] purport to make is a process of gathering and analyzing

information of a specified content, then displaying the results, and not any particular assertedly

inventive technology for performing those functions."  *Id.*; *see also In re TLI*, 823 F.3d at 610

(holding that method for recording images on a cell phone, transmitting those images to a server,

classifying those images, and storing them on the server based on that classification to be an

unpatentable abstract idea).

Although the Federal Circuit has not addressed a claim involving GPS location tracking,

multiple district courts have found that functions pertaining to obtaining and displaying location

information are not patentable.  For example, in *MacroPoint, LLC v. FourKites, Inc.*, 2015 WL

6870118 (N.D. Ohio Nov. 6, 2015), *aff'd*, 2016 WL 7156894 (Fed. Cir. Dec. 8, 2016), a district

court in the Northern District of Ohio discussed a claim for "a process for tracking freight" in

which a "communications device" was "correlated" to freight.  *Id.* at *3.  The communications

device then received a request, determined the location of the freight, and transmitted the freight's

location.  *Id.* at *1.  The *MacroPoint* court held the claim to be abstract because the claim

"disclose[d] nothing more than a process for tracking freight," using generic statements such as

the "transfer" of electronic signals.  *Id.*

Similarly, in *Callwave Commc'ns, LLC v. AT&T Mobility, LLC*, 2016 U.S. Dist. LEXIS

125486 (D. Del. Sept. 15, 2016), a district court in the District of Delaware addressed a method

claim in which (1) a subscriber identified a mobile platform to locate, (2) a remote tracking system

for that mobile platform was identified, (3) the location was requested and received from the

remote tracking system, and (4) the location was then transmitted to the subscriber.  *Id.* at *8.  The

Court held that the claim was drawn to the abstract idea of "relaying location-related information

through an intermediary."  *Id.* at *11.  The *Callwave* court held that this claim was abstract

because "[r]equesting and receiving location information is an abstract idea, and adding a vaguely

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1    defined intermediary that selectively forwards requests and returns responses does not make the

2    underlying abstract idea any more concrete."  *Id.* at *12–13.

3           Based on *Electric Power Group*, *Callwave*, and *MacroPoint*, the Court concludes that the

4    claims here are directed to an abstract idea.  As discussed above, claim 19 of the '593 patent is

5    directed to the gathering, transmission, and display of the location information of a certain subset

6    of individuals from a list, and claims 22 and 28 of the '647 patent are directed to the gathering,

7    transmission, and display of the location information of individuals requested to perform a service.

8    The Federal Circuit has held that the collection and display of information, even if it is limited to

9    "particular content," is an unpatentable abstract idea.  *Elec. Power Grp.*, 830 F.3d at 1353 (holding

10   that the collection and display of certain measurements on an electric power grid constitutes an

11   abstract idea).  *Id.*  All three claims here describe an apparatus or method that involves (1) a

12   request of location data of individuals, (2) that location data being obtained from the wireless

13   devices of those individuals, (3) a map with the locations of the individual or individuals being

14   transferred to the requestor of the location data.  This is similar to the process in *Callwave* where

15   the subscriber identified a "mobile platform to locate"; requested the location of that mobile

16   platform; and then received the location.  *Callwave*, 2016 U.S. Dist. LEXIS 125486 at *12–13.

17   Thus, the gathering, transmission, and display of the location information of a certain subset of

18   individuals from a list or of individuals requested to perform a service is analogous to claims the

19   Federal Circuit and district courts have found to be abstract.

20          The Court next turns to tests the Federal Circuit utilizes to determine whether a claim is

21   abstract.  First, the Court discusses whether analogous activities occur in the "brick-and-mortar"

22   context.  Second, the Court discusses "whether the claims are directed to an improvement in

23   computer functionality versus being directed to an abstract idea."  *Enfish*, 822 F.3d at 1335.

24                          **b.      Brick and Mortar Analogy**

25          In finding a claim to be directed to an abstract idea, the Federal Circuit has, at times,

26   analogized claims to activities in the "brick-and-mortar" context.  *Intellectual Ventures B*, 838

27   F.3d at 1317 (finding an email processing software program to be abstract through comparison to

28

21

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

a "brick-and-mortar" post office); *see also DirecTV*, 838 F.3d at 1258 (finding claim abstract because the idea of out-of-region broadcasting of local content "can be implemented in myriad ways ranging from the low-tech, such as by mailing copies of a local newspaper to an out-of-state subscriber, to the high-tech, such as by using satellites to disseminate broadcasts of sporting events."). Here, despite use of wireless devices and cell phones for the invention in this case, a similar functionality was achievable in the "brick-and-mortar" context without GPS and wireless devices with internet connectivity. Specifically, before GPS tracking and cellular phones, people could track the locations of individuals on a map. For example, a military general that needed information to determine strategy, even before the digital age, could have tracked the movements of friendly and enemy troops on a map using figurines or pushpins based on information obtained from a forward scout. Even a modern person could engage in similar behavior with respect to friends and family. If motivated, a person could call an individual that a person wants to track and place the information received in response on a map. Using GPS and wireless devices likely improves the efficiency of this process and eliminates the effort that would be necessary in the brick and mortar context. However, an improvement in efficiency created by moving to a new technological environment does not render a patent non-abstract. *See Alice*, 134 S. Ct. at 2355 (holding that simply applying a method on a computer does not make an abstract idea even if that technological environment improves the efficiency of the process at issue). Thus, the analogy to the brick-and-mortar context supports a finding that the character of the asserted claims as a whole is directed to an abstract idea.

### c.    Improvement in Computer Functionality

A claim is not abstract if it "improve[s] the functioning of the computer itself." *Alice*, 134 S. Ct. at 2359. Thus, *Enfish* held that it is "relevant to ask whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea, even at the first step of the *Alice* analysis." 822 F.3d at 1335. The Federal Circuit has issued only two decisions that have found patentable subject matter at *Alice*'s first step. In *Enfish*, the Federal Circuit held that the claims at issue were directed "to a specific improvement to the way computers operate," in

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

the form of a data structure that used a "self-referential table." *Enfish*, 822 F.3d at 1335.  Rather than simply automating a process using a computer as a tool, the claims involved "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." *Id.* at 1337.

Similarly, in *McRO v. Bandai Namco Games America Inc.*, the Federal Circuit held that a method for automating the animation of lip movement and facial expressions, which replaced an animator's subjective evaluation with automated rules, was not an unpatentable abstract idea. *McRO*, 837 F.3d at 1313–16.  The Federal Circuit reasoned that because the method involved "a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type," it did not just use a computer "as a tool to automate conventional activity" but instead constituted an improvement to an existing technological process itself.  *Id.* at 1314.

However, the Federal Circuit has noted that "[a] patent may issue 'for the means or method of producing a certain result, or effect, and not for the result or effect produced.'"  *McRO*, 837 F.3d at 1314 (quoting *Diamond v. Diehr*, 450 U.S. 175, 182 n.7 (1981)).  Accordingly, the Federal Circuit has declined to find that a case falls under the principles found in *Enfish* and *McRO* when "the claimed invention is entirely functional in nature."  *See, e.g.*, *DirecTV*, 838 F.3d at 1258.  Generally, claims that contain improvements in computer functionality, and thus are patentable under *Enfish* and *McRO*, involve instructions on "how to implement" the abstract idea.  *Id.*

Here, the Court finds that the character of the asserted claims is not itself an improvement in the technology used for gathering, transmitting, and displaying the location information of a certain subset of individuals from a list or individuals requested to perform a service.  In both *Enfish* and *McRO*, the character of the claim as a whole was itself a technological advance that improved computer functionality.  *See Enfish*, 822 F.3d at 1335 (character of the claim was an improved database structure); *McRO*, 837 F.3d at 1314 (character of claim was an improved means of performing computer animation).  Here, the gathering, transmission, and display of the location information of a certain subset of individuals from a list or individuals requested to perform a service does not improve the functioning of a computer.

23

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
Northern District of California

This conclusion is underscored by the fact that the asserted claims are described in functional terms.  As noted above, claim 19 of the '593 patent claims the use of a server, a database, and software that obtains the location of cell phones associated with individuals on a buddy list, plots those locations on a map, and then displays that map to the first individual.  '593 Patent at col. 30:49–col. 31:2.  Additionally, claims 22 and 28 of the '647 patent describe a method and software that allow a person to select a service provider on a wireless device, obtain location information from the service provider's wireless device, and display a map showing the location of the service provider on the service requestor's wireless device that intermittently updates.  '647 patent at col. 30:47–col. 31:12.  These claims simply describe the "effect or result produced" not "how to implement" the desired result.  *McRO*, 837 F.3d at 1314 (quoting *Diehr*, 450 U.S. at 182 n.7); *DirecTV*, 838 F.3d at 1258.  That is, they describe that location information will be gathered, transmitted, and displayed rather than describe how those processes will function or focus on any particular tool that achieves the desired result.

Plaintiff argues that the Court should look to particular claim limitations as part of the step one analysis.  Opp'n at 115–17 (arguing that the "self-update," "time-limit," and other features constitute improvements in technology).  In *Bascom*, the Federal Circuit declined to address claim limitations in step one of the *Alice* analysis.  *Bascom*, 827 F.3d at 1349.  Although the *Bascom* court acknowledged that such an analysis occurred in *Enfish*, the *Bascom* court noted that such an analysis was only appropriate because the claims in *Enfish* were "unambiguously directed to an improvement in computer capabilities."  *Id.*  In contrast, the claims in *Bascom* were "directed to filtering content on the Internet," and, when pressed to consider the impact of more specific claim limitations, the *Bascom* court only concluded that "the claims and their specific limitations do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea."  *Id.* at 1348–49.

The specific claim limitations identified by Plaintiff present a similar situation here.  As discussed above, an assessment of the "character as a whole" of the asserted claims reveals that they are "directed to" known abstract ideas (the gathering, transmission, and display of the

24

location information of a certain subset of individuals from a list or individuals requested to perform a service).  Indeed, the Court concluded above that limitations such as "self-update," "time-limit," and other features are not significant enough to change the character of the claims as a whole.  Accordingly, as in *Bascom*, the Court "defer[s its] consideration of the specific claim limitations' narrowing effect for step two" of the *Alice* analysis.  *Id.*

Accordingly, the Court finds that claim 19 of the '593 patent and claims 22 and 28 of the '647 patent are directed to abstract ideas because the asserted claims are analogous to prior cases where the Federal Circuit found claims to be directed to an abstract idea; the asserted claims' actions are comparable to activities in the "brick-and-mortar" context; and the asserted claims do not recite improvements in computer functionality.

### B.    *Alice* Step Two—Evaluation of Abstract Claims for an Inventive Concept

A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations—considered individually or as an ordered combination—serve to "transform the claims into a patent-eligible application."  *Content Extraction*, 776 F.3d at 1348.  Thus, the second step of the *Alice* analysis (the search for an "inventive concept") asks whether the claim contains an element or combination of elements that ensures that the patent in practice amounts to significantly more than a patent upon the abstract idea itself.  *Alice*, 134 S. Ct. at 2355.

The United States Supreme Court has made clear that a transformation of an abstract idea to a patent-eligible application of the idea requires more than simply reciting the idea followed by "apply it."  *Id.* at 2357 (quoting *Mayo*, 566 U.S. at 72).  In that regard, the Federal Circuit has repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than the performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2359) (alterations in original); *see also Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (holding that "generic computer components such as an 'interface,' 'network,' and 'database' . . . do not satisfy the inventive concept requirement."); *Bancorp Servs.*, 687 F.3d at

25

United States District Court
Northern District of California

1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the

claimed invention, facilitating the process in a way that a person making calculations or

computations could not.").  Similarly, "[i]t is well-settled that mere recitation of concrete, tangible

components is insufficient to confer patent eligibility to an otherwise abstract idea" where those

components simply perform their "well-understood, routine, conventional" functions.  *See In re*

*TLI*, 823 F.3d at 613 (limitations of "telephone unit," "server," "image analysis unit," and "control

unit" insufficient to adequately narrow abstract idea of "classifying and storing digital images in

an organized manner" under step two of the Alice framework) (quotation marks omitted).

In addition, the United States Supreme Court explained in *Bilski* that "limiting an abstract

idea to one field of use or adding token postsolution components [does] not make the concept

patentable."  *Bilski*, 561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584, 589 (1978)); *see also*

*Alice*, 134 S. Ct. at 2358 (same).  The Federal Circuit has similarly stated that attempts "to limit

the use of the abstract idea to a particular technological environment" are insufficient to render an

abstract idea patent-eligible.  *Ultramercial*, 772 F.3d at 716 (quotation marks omitted); *see also*

*Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015)

("*Intellectual Ventures A*") ("An abstract idea does not become nonabstract by limiting the

invention to a particular field of use or technological environment, such as the Internet.").

Here, Defendant argues that the claims "recite generic technologies" to "implement the

underlying abstract idea."  Mot. at 17.  Indeed Defendant argues that each of the pieces of

technology identified in the claim limitations are conventional and generic: wireless devices, cell

phones, GPS receivers, a server, software, a database, a map with zoom capabilities, and a use

specific group and buddy list.  *Id.* at 19.  Moreover, Defendant argues that the combination of each

of these elements is conventional and "does not purport to claim a new technology."  Mot. at 19.

In response, Plaintiff does not argue that any of the technological components of the claims

provide an inventive concept on their own.  Instead, Plaintiff argues that the "ordered

combination" of the claim limitations provides an "inventive concept" that renders the claims

patentable.  Opp'n at 21.

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

The Court's "search for an inventive concept" begins with the individual claim limitations, and then turns to the claim limitations as an "ordered combination."

### 1.       Individual Claim Limitations

The asserted claims here contain many individual claim limitations.  The Court first addresses the physical components listed in the claims, then discusses the software and method steps, and finally discusses the "buddy list" and "use specific group."  The Federal Circuit has held that an inventive concept is not present where "[t]he claim simply recites the use of generic features of cellular telephones, such as a storage medium and a graphical user interface, as well as routine functions, such as transmitting and receiving signals, to implement the underlying idea." *DirecTV*, 838 F.3d at 1258.  Here, the Court finds that the physical components described in all of the claims are generic and conventional, including the claimed "server," "cell phone," "wireless device," and "GPS."  *See* '593 Patent at col. 2: 10–50 ("The functionality implemented by the software of the invention utilizes existing platforms and infrastructure.").  The claims contain no indication that these "existing platforms and pieces of infrastructure" are used in a non-conventional manner.  *See Bascom*, 827 F.3d at 1349 (finding that "local client computer," "remote ISP server," "Internet computer network," and "controlled access network accounts" contained no inventive concept when looked at individually).  Moreover, the "database" in claim 19 of the '593 patent is a generic computer element.  *See Intellectual Ventures A*, 792 F.3d at 1366 (a "database" is a "generic computer element[]").

Even the use of "software" identified in claim 19 of the '593 patent, and the steps that the software was required to perform, does not itself provide an inventive concept as the software is simply the medium for carrying out the functions that are the focus of the claim.  To be sure, there is no "categorical ban on software patents."  *Enfish*, 822 F.3d at 1339.  However, the application of a method using software does not provide an inventive concept where the "difficulty of the programming details . . . are not recited in the actual claims."  *Apple, Inc. v. Ameranth, Inc.*, 2016 WL 6958650, at *8 (Fed. Cir. Nov. 29, 2016).  In claims like those at issue here, where the claims simply recite functions like "request and store position information," the simple statement that the

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

functions are carried out on "software" does not provide an inventive concept.

The use of a zoomable map also does not provide an "inventive concept" in this case.  The specification provides no indication that the use of maps to display location information was anything but conventional at the time.  In fact, the specification notes that the maps are obtained in a conventional manner from then-existing mapping services.  *See* '593 patent at 14:13–22 ("In the preferred embodiment, the Buddy Watch server pulls an appropriate map from the MapQuest server.").  Moreover, other courts have held that a "zoomable" feature is an unpatentable abstract idea.  *Peschke Map Techs. LLC v. Rouse Props. Inc.*, 168 F. Supp. 3d 881, 888 (E.D. Va. 2016) ("[T]he use of multiple layers of maps that enables users to zoom into and out of a geographic areas is an unpatentable abstract idea.").  Since the claim on the "map" and its "zoom" functions simply state their presence and not any inventive way of implementing that functionality, the zoomable map does not supply an inventive concept.  *See Apple*, 2016 WL 6958950 at *8 (noting that, without details of implementation, adding certain features that are themselves abstract ideas does not provide an inventive concept).

Additionally, each of the steps described in the claims for gathering, transmitting, and displaying the location information of a certain subset of individuals from a list or individuals requested to perform a service involves generic, functionally-described steps.  For example, claim 19 of the '593 patent notes that the claimed software can "request and store position information" and is "responsive to a request . . . to obtain a map."  *Id.* at col. 30:55–65.  The claims in the '647 patent are even more general, as they claim a method with steps like "caus[ing] receipt of information on the first wireless device representing position of the second wireless device."  '647 patent at col. 31:40–44.  Functions such as requesting, receiving, and storing information over a network are not inventive.  *See buySAFE*, 765 F.3d at 1355 (noting that the use of a "computer network . . . is not even arguably inventive); *Rothschild Location Techs. LLC v. Geotab USA, Inc.*, 2016 WL 2847975, at *3 (E.D. Tex. May 16, 2016) ("[A]s the Federal Circuit persistently holds, two computers communicating over a network is not inventive.").

Finally, the Court turns to the remaining element, the use of a "buddy list" in claim 19 of

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
Northern District of California

the '593 patent and the creation of a "use specific group" in claims 22 and 28 of the '647 patent. The Court need not discuss whether the "buddy list" or "use specific group" provide an inventive concept on their own because the Court concludes below that, at the motion to dismiss stage, the use of the "buddy list" or "use specific group," in conjunction with the other features of the invention, provides an "inventive concept."

### 2.    Ordered Combination of Claim Limitations

The Court next turns to whether the "ordered combination" of the claim limitations provides an inventive concept.  In making this analysis, the Court looks to the Federal Circuit's decisions in *Bascom* and *Amdocs*, both of which address the inventive concept analysis.

In *Bascom*, the Federal Circuit addressed a claim for a particular type of internet content filtering.  *Bascom*, 827 F.3d at 1350.  The Federal Circuit noted that internet content filtering was a generic concept, but that it had faced a number of technological issues.  *Id.*  Specifically, in one type of content filtering, the program would be executed on end-user computers.  *Id.*  While this configuration allowed customizability of the filters for each end user, the execution on the end-user's computer meant that tech-savvy individuals could bypass the filters.  *Id.*  In contrast, other types of content filtering implemented the filtering at the internet service provider, which prevented tampering, but would not allow customizable filtering settings for each end-user.  *Id.* The invention in *Bascom*, however, combined the benefits of each of these filtering methods by "install[ing] a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user."  *Id.*  To do so, it "harness[ed] [a] technical feature of network technology": "the ability of at least some ISPs [(internet service providers)] to identify individual accounts that communicate with the ISP server, and to associate a request for Internet content with a specific individual account."  *Id.*  By combining this technical feature with content filtering, it claimed a specific, "technology-based solution" that "overc[ame] preexisting problems with other Internet filtering systems."  *Id.* at 1352.  Thus, even though the filtering of internet content was a generic abstract idea, this "non-conventional and non-generic arrangement of known, conventional pieces" created an inventive concept.  *Id.* at 1350.

29

United States District Court
Northern District of California

1    Moreover, in *Amdocs*, the Federal Circuit found that claims relating to solutions for

2    managing accounting and billing data over large, disparate networks recited an inventive concept

3    because they contained "specific enhancing limitation[s] that necessarily incorporate[d] the

4    invention's distributed architecture." *Amdocs*, 841 F.3d at 1301.  The use of a "distributed

5    architecture," where information about accounting and billing data was stored near the source of

6    the information in the "disparate networks," transformed the claims into patentable subject matter

7    by providing improvements in functionality.  *Id.*  Notably, the claims themselves only referred to

8    the application of "enhance[ments]" and did not discuss this "distributed architecture."  *Id.*

9    However, the prior claim construction by the district court made clear that the enhancements

10   integrated the architecture defined in the specification.  *Id.*  Thus, the Federal Circuit concluded

11   that "the technology at issue entail[ed] an unconventional technological solution (enhancing data

12   in a distributed fashion) to a technological problem (massive record flows which previously

13   required massive databases)."  *Id.*

14   Here, the Court first discusses whether the asserted claims' "buddy list" or "use specific

15   group," combined with the generic request and receive functions described in the claims, provide a

16   sufficient inventive concept to survive a motion to dismiss.  As in *Bascom*, the Court finds

17   guidance in the specification regarding what was conventional at the time of the invention.

18   *Bascom*, 827 F.3d at 1350.  The specification of the X One Patents describes certain problems in

19   the conventional GPS tracking technology that the X One Patents aimed to cure.  The specification

20   described two pieces of prior art: (1) the use of OnStar to track cars with GPS, which relied on

21   "GPS receivers and cellular phone capability built into a car;" and (2) "phones that were set up at

22   the manufacturer to enable parents to locate their children."  *See* '593 patent at col. 1:33–34, col.

23   1:54–55.  The specification notes that, in this prior art, "there [was] no mechanism to add groups

24   and members of groups, and there [was] no mechanism to set up 'instant buddies' as that term is

25   used below (temporary location sharing between phones on an ask and accept basis which

26   automatically expires after a configurable interval terminates)."  *Id.* at col. 1:62–66.  Instead, the

27   pairing between tracker and trackee had to be permanently set at the time of manufacture.  *Id.* at

28

30

United States District Court
Northern District of California

1    col. 1:49-52.

2         The invention's solution to this problem is the use of a dynamic "buddy list" or "use-

3    specific group," which could be "programmed into a . . . device." *Id.* at col. 2:53–54.  This

4    enabled "users [to] change things on the fly in the field such as by "adding groups and members;

5    adding instant buddies, changing the size of the area in which their buddies can be tracked,

6    enabling or disabling the location sharing function without disabling the phone, etc." *Id.* at col.

7    3:20–25.

8         The term "buddy list" from claim 19 of the '593 patent and the term "use specific group"

9    from claims 22 and 28 of the '647 patent, when viewed in light of the specification shared by both

10   the '593 patent and the '647 patent, refer to the same inventive concept.  *See Amdocs*, 841 F.3d at

11   1301 (integrating the architecture outlined in the specification to define the term "enhance").  For

12   example, the specification describes the "buddy list" as a dynamic, reconfigurable, electronic list,

13   which is stored on the "Buddy Watch" server or on each wireless device.  '593 Patent at col.

14   11:35–37.  The specification notes that "Buddies can be added or deleted from a list at any time,"

15   and that a user can only "receive position updates" from users listed on the buddy list.  *Id.*

16        Similarly, with respect to the '647 patent, the term "use specific group" does not appear in

17   the specification.  The specification provides an avenue for the creation of "instant buddies,"

18   which is a method equivalent to the "use specific group" described in claims 22 and 28 of the '647

19   patent.  *Id.*  Such buddies can be formed "where the wireless device places or receives a call from

20   a Buddy Watch enabled wireless device to or from another Buddy Watch enabled wireless

21   device."  *Id.*  Thus, both "buddy list" and "use specific group" do not simply refer to lists, but to a

22   specific means of dynamically adding people that can be tracked.  Moreover, the specification

23   states that the wireless devices communicate with the Buddy Watch server "via the internet" via

24   "TCP/IP data compliant packets," and describes several instances where updates to buddy list

25   information on the Buddy Watch server are effectuated through "packet" communications.  *See,*

26   *e.g.*, *id.* at col. 14:7–12,14:57–63.  Thus, the system appears to leverage the certain technical

27   capabilities of the phones—the fact that they are "web-enabled"—to effectuate the dynamic nature

28

United States District Court
Northern District of California

31

1    of the "buddy list."

2        Combining the dynamic "buddy list" and "use specific group" systems to GPS tracking

3    constitutes a "non-conventional and non-generic arrangement of known, conventional pieces."

4    *Bascom*, 827 F.3d at 1350.  Even assuming the buddy list and use specific group functionality

5    described above are each conventional on their own, the information in the specification indicates

6    that the combination of a buddy list or use specific group with GPS tracking is not conventional.

7    *See* '593 patent at col. 1:62–66.  Instead of requiring a manufacturer to permanently link the two

8    wireless devices, as in the child-tracking prior art, the users of the X One Patents can add or

9    remove persons being tracked through modifications of the buddy list or through the creation of a

10   use specific group.  Accordingly, the claims "harness[] [a] technical feature of network

11   technology"—a buddy list that has the ability to be created and modified by users at any time—to

12   provide a "technical improvement over prior art ways of [gathering, transmitting, and displaying

13   the location information of a certain subset of individuals from a list or individuals requested to

14   perform a service]."  *Bascom*, 827 F.3d at 1350.  The buddy list itself also leverages certain

15   technical features of the devices in the system.  The dynamic nature of the buddy list and the use

16   specific group is enabled by the facts that the devices are "web-enabled," have a certain amount of

17   memory, and can run certain software.  *See id.* (noting that the invention "leveraged" the already

18   existing abilities for ISP servers to allow individuals to login).  Accordingly, the combination of a

19   dynamic buddy list or use specific group and GPS technology transforms the abstract idea of the

20   gathering, transmission, and display of the location information of a certain subset of individuals

21   from a list or individuals requested to perform a service into a "specific, discrete implementation"

22   of this idea that is sufficient to qualify as patent-eligible subject matter.  *Id.*

23       Moreover, the implementation of the dynamic "buddy list" and "use specific group" allows

24   for the two-way sharing of information, a feature not available in the conventional technology.

25   *See* '593 patent at col. 1:62–66 (noting that the OnStar and child-tracking prior art did not allow

26   for two-way sharing).  Defendant points out that the claims are worded in such a way as to

27   indicate merely one-way information sharing.  Mot. at 12.  However, the methods described in

28

32

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1   claims 22 and 28 of the '647 patent involve methods that allow sharing between a "first wireless

2   device and the second wireless device," which indicates that the first and second wireless devices

3   are interchangeable.  '647 patent at col. 31:37–col. 32:5.  Similarly, claim 19 of the '593 patent

4   allows a "first individual" to "obtain a last known position for multiple users identified by the

5   buddy list," which indicates that each of those multiple users can be the "first individual" tracking

6   all of the other multiple users on the buddy list.  This interpretation is confirmed by the

7   specification itself, which indicates that location information is transferred both to and from each

8   user in the buddy list.  '593 patent at Fig. 3A & 3B (flowchart indicating the two-way flow of

9   information).

10          In response, Defendant argues that the use of "lists" to track the individuals was already

11   present in prior art that was disclosed on the face of the patent in this case.  *See* ECF No. 24-3,

12   U.S. Patent No. 7,116,985 (disclosing an invention that allows user to "identify the locations of

13   select individuals" on a "friends list").  However, the fact that prior art already accomplished the

14   combination of a list of individuals as part of GPS tracking does not necessarily prevent the

15   Court's finding of an inventive concept.  Generally, "[t]he 'novelty' of any element or steps in a

16   process, or even of the process itself, is of no relevance in determining whether the subject matter

17   of a claim falls within the § 101 categories of possibly patentable subject matter."  *Intellectual*

18   *Ventures B*, 838 F.3d at 1315 (quoting *Diehr*, 450 U.S. at 188–89); *see also Rapid Litig. Mgmt.*

19   *Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1052 (Fed. Cir. 2016) (rejecting the argument that adding

20   a second freeze-thaw cycle was not an inventive concept because it was allegedly obvious,

21   reasoning that "patent-eligibility does not turn on ease of execution or obviousness of application.

22   Those are questions that are examined under separate provisions of the Patent Act."  (citing *Mayo*,

23   566 U.S. at 90)).  Instead, the question on step two of *Alice* is whether the implementation of the

24   abstract idea involved "more than the performance of 'well-understood, routine, [and]

25   conventional activities previously known to the industry.'"  *Content Extraction*, 776 F.3d at 1347–

26   48 (quoting *Alice*, 134 S. Ct. at 2359).  However, both the United States Supreme Court and the

27   Federal Circuit have acknowledged that "the § 101 patent-eligibility inquiry and, say, the § 102

28

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

1   novelty inquiry might sometimes overlap." *Synopsys*, 839 F.3d at 1151 (quoting *Mayo*, 566 U.S.

2   at 90).

3          The Court acknowledges that, in light of the above-mentioned prior art, this case presents a

4   close call as to whether the asserted claims involve "more than the performance of 'well-

5   understood, routine, [and] conventional activities previously known to the industry." *Content*

6   *Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2359).  However, on a motion to

7   dismiss the Court "construe[s] the pleadings in the light most favorable to the nonmoving party."

8   *Manzarek*, 519 F.3d at 1031; *see also Content Extraction*, 776 F.3d at 1349 (approving the district

9   court's construction of a claim in the manner most favorable to the patent owner).  Moreover, as

10  discussed above, the Federal Circuit's recent decisions in *Bascom* and *Amdocs* indicate that the

11  combination of the dynamic "buddy list" or "use specific group" with GPS technology does

12  provide an inventive concept that satisfies step two of *Alice*.  Accordingly, the Court DENIES

13  Defendant's motion to dismiss.

## IV.   CONCLUSION

15         For the foregoing reasons, the Court DENIES Defendant's motion to dismiss.

16  **IT IS SO ORDERED.**

18  Dated: March 6, 2017

19

20  LUCY H. KOH
    United States District Judge

Case No. 16-CV-06050-LHK
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
Northern District of California